## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 13 2019, 9:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David W. Stone IV
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Suan Patrick Mahoney,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

June 13, 2019

Court of Appeals Case No.
18A-CR-3042

Appeal from the Madison Circuit Court

The Honorable David A. Happe, Judge

Trial Court Cause No.
48C04-1708-F5-2082

**Baker, Judge.**

[1] Suan Mahoney appeals his convictions for two counts of Level 5 Felony Intimidation While Drawing or Using a Deadly Weapon,[1] arguing that the jury received an erroneous instruction and that the evidence was insufficient to support the convictions. Finding no error and the evidence sufficient, we affirm.

# Facts

[2] In August 2017, Anderson Street Department employees were working next to a local restaurant called Bobber's Cafe on various projects, including paving a trailway, cleaning out weeds around a nearby lake, and spreading gravel on a parking lot. In order to spread the gravel, the city employees frequently asked Bobber's Cafe patrons to move their cars off the pavement.

[3] On August 14, 2017, Eric Hamilton, a skilled operator for the Anderson Street Department, went into Bobber's Cafe and asked a restaurant employee, Rick Shaw, if he would ask the customers to move their vehicles off the pavement. Most customers complied with the request, moved their vehicles, and returned to the restaurant. Mahoney, who was at Bobber's Cafe that day, also left the restaurant but began spewing racial epithets at the city employees. Before anyone could intervene, Mahoney got into his vehicle and left the area. The city employees told their foreman, Steve Turner, about the incident. He stated that

---

[1] Ind. Code §§ 35-45-2-1(a)(2), -1(b)(2)(A).

if there were any other issues, they were to take down Mahoney's license plate number and contact him.

[4] The next day, on August 15, 2017, Mahoney returned to Bobber's Cafe. Customers were again asked to move their vehicles off the parking lot, which most did. Inside, Hamilton noticed Mahoney, approached him, and expressed that he hoped Mahoney was in a "better mood" that day since Mahoney was going to have to move his vehicle like the day before. Tr. Vol. II p. 211. This comment set Mahoney off "[l]ike . . . a firecracker." *Id.* at 212. Once again, Mahoney started shouting racial epithets as he and Hamilton left the restaurant.

[5] While outside, another Anderson Street Department employee, Marquis McCloud, asked Mahoney why he was using such offensive racial slurs and demanded that he stop calling them derogatory names. Mahoney escalated the situation by screaming at the city employees and telling them that they needed to leave. Enraged, McCloud approached Mahoney. While other city employees attempted to intervene, Mahoney reached for the holster on his waist and started "jerking on his gun[]" and continuously "pulling it up and down as he was saying . . . what he would do with the gun." *Id.* at 209, 213. He kept saying, "I'll shoot you" and "I'm gonna kill, I'm gonna shoot 'em," and repeatedly called McCloud, Hamilton, and the other employees the "N-word." *Id.* at 203; Vol. III p. 123. Fearing for their lives, the city employees tried to find cover.

[6] Shaw, the restaurant employee, had just returned from moving a vehicle off the pavement when he saw Mahoney threatening the city employees. Shaw

demanded that Mahoney leave, and as he left, Mahoney held onto his gun and told the city employees that "you all deserve bullets in your head." Tr. Vol. II p. 213. Mahoney continued standing next to his vehicle when Shaw witnessed "a gun laying on the seat with [Mahoney's] hands on the gun." Tr. Vol. III p. 25. After Shaw again told Mahoney to leave the area, Mahoney drove off. Turner, the foreman for the city employees, arrived soon thereafter and called the police. The police arrested Mahoney later that day and confiscated his firearm.

[7]     On August 16, 2017, the State charged Mahoney with two counts of Level 5 felony intimidation while drawing or using a deadly weapon. At Mahoney's October 22-24, 2018, jury trial, the trial court instructed the jury on what it means to "use" a firearm:

> "Use," defined
>
>> In the context of the crime of Intimidation, to "use" a firearm includes brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm.
>
> *Daniels v. State*, 957 N.E.2d 1025, 1030 (Ind. App. 2011)

Appellant's App. Vol. II p. 123. Mahoney did not object to this instruction.

[8]     The jury found Mahoney guilty as charged. On November 20, 2018, the trial court sentenced Mahoney to four years in the Department of Correction, with two years suspended to probation. Mahoney now appeals.

# Discussion and Decision

# I. Jury Instruction

First, Mahoney argues that the jury received an erroneous instruction. Because Mahoney did not object to the final instruction, we must determine whether there was fundamental error.

To determine whether an instruction is fundamentally erroneous, we will review the record in its entirety to determine whether an honest and fair-minded jury would have rendered a guilty verdict absent use of the erroneous instruction. *Coleman v. State*, 630 N.E.2d 1376, 1378 (Ind. Ct. App. 1994). Furthermore, we do not evaluate the alleged erroneous instruction in isolation, but rather in context of all relevant information given to the jury to determine if the jury was misled as to a correct understanding of the law. *Boesch v. State*, 778 N.E.2d 1276, 1279 (Ind. 2002).

Mahoney concedes that *Daniels v. State*, 957 N.E.2d 1025 (Ind. Ct. App. 2011), is valid precedent, but argues that the definition of "use" found in that case is erroneous. Mahoney essentially asks us to revisit *Daniels* and to rule that its definition of use of a firearm—including the acts of displaying and brandishing—is incorrect as a matter of law due to its breadth and vagueness.

In *Trice v. State*, this Court found that mere possession of a firearm does not amount to use, holding as follows:

> [T]he definitions of the term "misuse" can best be applied here to mean that a conviction for the *misuse* of a firearm must involve some *use* of the firearm that is incorrect, improper, or unsuitable. Trice did not use the handgun; rather, he was merely in possession of it. Thus, it defies logic and relevant precedent to say that he misused the handgun.

114 N.E.3d 496, 501 (Ind. Ct. App. 2018) (emphases in original), *trans. denied*. To arrive at its determination, the *Trice* Court relied heavily on the definition of "use" in *Daniels*.

[13] Notwithstanding the fact that *Daniels* is precedent that has not been overturned, Mahoney still argues that the trial court provided an incorrect jury instruction because its core definition of "use" is wrong. Mahoney's argument is unavailing. *Trice* and *Daniels* reasonably relied on Indiana Supreme Court precedent in determining that "use" of a firearm may include such actions as "brandishing, displaying, bartering, striking with, and . . . firing or attempting to fire, a firearm." *Daniels*, 957 N.E.2d at 1030. In other words, the *Daniels* Court analyzed numerous sources of law—including references to a federal circuit court case and secondary material—and synthesized that information into a coherent, reasonable, and appropriate definition.

[14] We are not persuaded that the definition of "use" as established in *Daniels* was legally incorrect. *Daniels* appropriately clarified what "use" of a firearm means for future cases. In evaluating precedent, deference to the legislature, and a strict construction of criminal statutes against the State with ambiguities resolved in favor of the defendant, *see Chastain v. State*, 58 N.E.3d 235, 238 (Ind.

Ct. App. 2016), *trans. denied*, we find that the jury instruction is reasonable and describes actions that distinguish between possession and use, including the acts of displaying and brandishing. Consequently, this jury instruction was not incorrect or misleading. Therefore, there was no fundamental error.

# II. Sufficiency of Evidence

Next, Mahoney argues that the evidence was insufficient to support his convictions for two counts of Level 5 felony intimidation while drawing or using a deadly weapon.

When reviewing the sufficiency of the evidence supporting a conviction, we must affirm if the probative evidence and reasonable inferences drawn therefrom could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005). It is not our job to reweigh the evidence or to judge the credibility of the witnesses, and we consider any conflicting evidence most favorably to the trial court's ruling. *Wright v. State*, 828 N.E.2d 904, 906 (Ind. 2005).

To convict Mahoney of Level 5 felony intimidation while drawing or using a deadly weapon, the State was required to prove beyond a reasonable doubt that while drawing or using a deadly weapon, Mahoney communicated a threat to another person with the intent that the other person be placed in fear of retaliation for a prior lawful act. I.C. §§ 35-45-2-1(a)(2), -1(b)(2)(A).

[18] First, it is undisputed that Mahoney communicated a threat with the intent to place others in fear of retaliation for a prior lawful act. Mahoney deliberately targeted the city employees because of their race and spewed racial obscenities at them. As he left, Mahoney told the city employees that "you all deserve bullets in your head[,]" tr. vol. II p. 213, while jerking his gun up and down in his holster. Additionally, when confronted by both Hamilton and McDonald, Mahoney told them that "I'll shoot you[]" while repeatedly calling them the "N-word." Tr. Vol. III p. 123. The fact that the city employees attempted to hide from Mahoney is further evidence that he threatened them and placed them in fear for the lawful act of asking Mahoney to move his car off the pavement.

[19] Then, as to whether Mahoney used a deadly weapon while communicating that threat, Mahoney openly carried his firearm around his waist and outside his clothing. Though Mahoney claims that he did not intentionally display his firearm because it was already exposed and that he was merely in possession of it, there is evidence that he reached for the holster on his waist and started "jerking on his gun[]" and continuously "pulling it up and down as he was saying . . . what he would do with the gun." Tr. Vol. II p. 209, 213. Multiple witnesses confirmed that Mahoney did just that. Additionally, Shaw testified that he saw "a gun laying on the seat [of Mahoney's vehicle] with [Mahoney's] hands on the gun." Tr. Vol. III p. 25. This evidence could have allowed a reasonable trier of fact to conclude that Mahoney was using—and not just possessing—his firearm by displaying it. Mahoney went even further, jerking

his firearm up and down, communicating his desire to shoot people, and holding onto the gun when it was outside the holster and in his vehicle. Thus, the evidence is sufficient.

[20] The judgment of the trial court is affirmed.

Najam, J., and Robb, J., concur.